CITY OF BRIGHTON v TOWNSHIP OF HAMBURG

Docket No. 234703. Submitted June 11, 2003, at Lansing. Decided January 15, 2004, at 9:05 A.M.

The city of Brighton brought an action in the Livingston Circuit Court against the township of Hamburg, seeking to have the court set aside a township ordinance that set what the township regarded as more rigorous standards than the state standards for water pollution control in its jurisdiction. The ordinance was in response to city plans to approximately double its wastewater treatment facility in the township. The Attorney General and the Department of Environmental Quality (DEQ) intervened as plaintiffs. The court, Daniel A. Burress, J., granted summary disposition for the plaintiffs on the basis that the township ordinance is preempted as a matter of law by the Natural Resources and Environmental Protection Act (NREPA), MCL 324.3101 *et seq.* The township appealed.

The Court of Appeals *held*:

1. The ordinance is preempted because there is a comprehensive scheme set forth in NREPA that occupies the field of regulation the municipality seeks to enter and the regulated subject matter demands exclusive state regulation to achieve the uniformity necessary to serve the state's purpose or interest.

2. NREPA is far-reaching legislation that demonstrates the Legislature's intent to achieve uniformity and to serve the public policy interest of protecting the waters of our state. The Legislature enacted a pervasive state regulatory scheme impliedly showing its intent to preempt the field of regulation regarding the discharge of waste into the waters of the state, and the DEQ is the only agency authorized to grant a discharge permit for waste effluent into the waters of the state.

3. Solid waste and hazardous waste have been determined to be subject matters that require statewide regulation and the preemption of local ordinances. Similarly, effective regulation of water pollution requires statewide control and preemption of local ordinances. If each municipality, township, and county were able to establish its own effluent discharge limitations, a great deal of uncertainty and confusion would be created.

Affirmed.

WATERS AND WATERCOURSES — NATURAL RESOURCES ENVIRONMENTAL PROTEC-
    TION ACT — LOCAL ORDINANCES — WASTEWATER EFFLUENT.

 Local ordinances to control the contents of wastewater effluent being
  distributed into state waters are preempted by the Natural
  Resources Environmental Protection Act because the Legislature
  has established a comprehensive scheme of laws that occupies the
  field of regulation the local ordinances seek to enter and because
  the regulated subject matter demands exclusive state regulation to
  achieve the uniformity necessary to serve the state's purpose or
  interest (MCL 324.3101 *et seq.*).

*Paul E. Burns* for the city of Brighton.

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Gary L. Finkbeiner*, Assistant Attorney General, for the Department of Environmental Quality.

*Johnson, Rosati, LaBarge, Aseltyne & Field, P.C.* (by *Marcelyn A. Stepanski* and *Carol A. Rosati*), for the defendant.

Before: MARKEY, P.J., and SAAD and WILDER, JJ.

SAAD, J. The township of Hamburg appeals an order granting summary disposition to the city of Brighton and intervening plaintiffs, Michigan Attorney General and Department of Environmental Quality (DEQ). We affirm.

I. NATURE OF THE CASE

This case presents the question of which level of government, state or local, has the authority to determine the permissible level of chemicals to be deposited in our state's waters, here into South Ore Lake, by a government-licensed wastewater treatment plant. Brighton sought to expand its wastewater treatment plant, located in Hamburg. After it obtained a permit

for the expansion from the DEQ, Brighton filed suit against Hamburg because Hamburg refused to accept Brighton's site plan application pursuant to a township moratorium on wastewater treatment plants. Thereafter, Hamburg adopted an ordinance that set stricter limits on the discharge of certain nutrients than the DEQ permit. Brighton claimed that Hamburg's discharge limits are preempted by state law and the trial court ultimately agreed.

Hamburg seeks to impose what it regards as more rigorous standards for water pollution control in its jurisdiction and argues that it has the right to do so to protect the health and safety of its residents. And, while Hamburg concedes that the Legislature vested substantial regulatory powers in the DEQ, it nonetheless insists that these powers are neither exclusive nor preemptive primarily because the statute does not expressly mandate preemption. Brighton and the DEQ contend, however, that under the seminal case of *People v Llewellyn*, 401 Mich 314; 257 NW2d 902 (1977), Hamburg's local ordinance is preempted as a matter of law by the Natural Resources and Environmental Protection Act (NREPA), MCL 324.101 *et seq.* The trial court agreed with this argument, and we agree with the trial court's conclusion and rationale.

Under Michigan law, the comprehensiveness and pervasiveness of the state regulatory scheme, coupled with the nature of the regulated subjected matter, water pollution, mandate preemption. Exclusive statewide regulation is vital to achieve the uniformity and consistency necessary to effectuate our state's public policy of maximum, effective protection of our state's water resources. On this point, we quote with approval the DEQ's brief:

In this case, the regulation of point source discharges and more importantly, the establishment of discharge effluent limits demands state-wide uniformity in order to allow the MDEQ to protect the waters of the state. Allowing each local unit of government consisting of a village, city, township, or county, to establish their [sic] own discharge effluent limits for discharges passing through each unit of government via its waterways, would undoubtedly create confusion where one discharger may be in violation of a city's discharge effluent limits but not in violation of the discharge effluent limits established by the county in which the city is located. Part 31 of the NREPA grants to the MDEQ the exclusive authority to protect the waters of the state which requires statewide regulation by the MDEQ. Because the surface waters of this state pass through numerous local units of government, the Legislature's enactment of Part 31 of NREPA can only be interpreted by this Court that Part 31 of NREPA sets forth a pervasive state-wide regulatory scheme which requires state-wide uniformity.

## II. FACTS AND PROCEDURAL HISTORY

This case arises out of Brighton's application to the DEQ to amend its existing discharge permit to expand the capacity of its wastewater treatment plant from 1.5 million gallons a day to three million gallons a day. In August 1999, after an exhaustive review and analysis, the DEQ issued a revised National Pollution Discharge Elimination Permit (NPDEP), with an effective date of November 1, 1999. But, in January 1999, and before the revised permit was issued, Hamburg filed with the DEQ objections under the Administrative Procedures Act (APA), 1969 PA 306, as amended, MCL 24.201 *et seq.*

Pursuant to the APA, a hearing was held in May of 2000 to hear Hamburg's objections. The hearing referee held in favor of Brighton, and thereafter, the DEQ

adopted the hearing referee's findings. To prevent the expansion of the wastewater treatment plant, however, Hamburg also passed an ordinance. Section 5 of Ordinance 69 conflicts with the DEQ's revised permit regarding the permissible level of chemicals to be discharged into South Ore Lake. That is, the regulations imposed by Hamburg's ordinance are more stringent than those established by the DEQ's revised permit.[1] Specifically, § 5 of the ordinance "prohibits an expansion or increase of surface water discharge containing nitrate nitrogen in excess of 200 parts per billion (micrograms per liter), or containing phosphorous in excess of 20 parts per billion (micrograms per liter) into waters located in and/or flowing through the Township."

Ultimately, motions for summary disposition were filed in the circuit court and, on May 1, 2001, Judge Daniel Burress, in a comprehensive and well-reasoned opinion, granted Brighton's motion for summary disposition on the grounds that state law preempts Hamburg's ordinance.[2]

---

[1] The DEQ promulgated administrative rules requiring permits to specify limitations on wastewater constituents, which must, at minimum, ensure compliance with federal standards and any more stringent limitations deemed necessary by the DEQ. 1999 AC, R 323.2137, 323.2142. Here, Brighton's DEQ permit does not limit one nutrient that Hamburg's ordinance restricts, nitrate nitrogen, and permits a greater concentration of the second nutrient, phosphorous.

[2] Though not necessarily germane to the narrow legal question of preemption, we note that Hamburg has sought stays to halt the construction of Brighton's wastewater treatment plant before the trial court and before this Court. Hamburg's requests were denied by both courts. Further, Brighton has sold bonds to fund the construction and expansion of the wastewater treatment plant in the amount of $8,950,000 and it executed a contract for $7,457,000 with a contractor for the expansion. Moreover, at the time of argument before this Court, the expansion had been substantially completed.

III. ANALYSIS

Our review of the trial court's preemption ruling is governed by principles articulated in *People v Llewellyn*. In *Llewellyn*, our Court said:

> A municipality is precluded from enacting an ordinance if 1) the ordinance is in direct conflict with the state statutory scheme, or 2) if the state statutory scheme pre-empts the ordinance by occupying the field of regulation which the municipality seeks to enter, to the exclusion of the ordinance, even where there is no direct conflict between the two schemes of regulation. [*Llewellyn, supra* at 322.]

Here, the ordinance may, in fact, be in "direct conflict" with the state statutory scheme. Ordinance 69 clearly interferes with the DEQ's ability to enforce NREPA because, if all eighty-three counties and their numerous townships and municipalities implemented their own water quality standards, there would be a patchwork of conflicting and unworkable standards throughout the state that would impede the DEQ's ability to maintain uniform and consistent regulation of water quality. However, we need not answer the narrow question whether the ordinance is in *direct conflict* with the state's statutory scheme—as opposed to simply being in conflict with the regulations promulgated by the DEQ. Rather, we find preemption on the alternative basis set forth in *Llewellyn*. Using this analysis, we find that the ordinance is preempted under the second part of the *Llewellyn* test because (1) the *comprehensive scheme* set forth in part 31 of NREPA clearly occupies the field of regulation that the municipality seeks to enter and (2) the regulated *subject matter* demands exclusive state regulation to

achieve the uniformity necessary to serve the state's purpose or interest.

Under the four-part test articulated in *Llewellyn*,[3] we first consider whether the state law expressly provides that its regulation will be exclusive because, if so, there would clearly be no doubt of preemption. Here, there is no express preemption. Also, under *Llewellyn*, we must ask if preemption of the field of regulation may be implied upon an examination of the legislative history. Because our review of the legislative history of NREPA leads us to conclude that it does not conclusively answer this question, we turn to parts 3 and 4 of the *Llewellyn* test to determine if the statutory scheme preempts the local ordinance.

*Llewellyn* provides that the comprehensiveness of the statutory scheme and the nature of the regulated subject matter may demand exclusive state regulation to achieve the uniformity necessary to serve the state's interest. Here, a close examination of NREPA and those preemption cases that address similar areas

---

[3] This Court quoted the *Llewellyn* test in *Southeastern Oakland Co Incinerator Auth v Avon Twp*, 144 Mich App 39, 43-44, 372 NW2d 678 (1985):

"In making the determination that the state has thus pre-empted the field of regulation which the city seeks to enter in this case, we look to certain guidelines.

"First, where the state law expressly provides that the state's authority to regulate in a specified area of the law is to be exclusive, there is no doubt that municipal regulation is pre-empted.

"Second, pre-emption of a field of regulation may be implied upon an examination of legislative history.

"Third, the pervasiveness of the state regulatory scheme may support a finding of pre-emption. . . . .

"Fourth, the nature of the regulated subject matter may demand exclusive state regulation to achieve the uniformity necessary to serve the state's purpose or interest." (Footnotes and citations omitted.) [Quoting *Llewellyn*, *supra* at 323-324.]

of environmental regulation compel the conclusion that part 31 of NREPA clearly preempts Hamburg's local ordinance.

### A. COMPREHENSIVE AND PERVASIVE REGULATORY SCHEME

A review of part 31 of NREPA reveals that, through this enactment, the Legislature established a pervasive and detailed state regulatory scheme covering point source discharges and effluent limits. This far-reaching legislation demonstrates the Legislature's intent to achieve uniformity and to serve the public policy interest of protecting the waters of our state.

Chapter 1 of part 31, which considers point source pollution control, states in pertinent part:

(1) The department shall protect and conserve the water resources of the state and shall have control of the pollution of surface or underground waters of the state and the Great Lakes, which are or may be affected by waste or disposal of any person. . . . The department shall enforce this part and shall promulgate rules as it considers necessary to carry out its duties under this part.

(2) The department may promulgate rules and take other actions as may be necessary to comply with the federal water pollution control act . . . . [MCL 324.3103.]

MCL 324.3106 grants the DEQ authority to establish pollution control standards and to issue permits for point source discharges into the waters of the state:

The department shall establish pollution standards for lakes, rivers, streams, and other waters of the state in relation to the public use to which they are or may be put, as it considers necessary. The department shall issue permits that will assure compliance with state standards to regulate municipal, industrial, and commercial discharges or storage of any substance that may affect the quality of the waters of

the state. The department may set permit restrictions that will assure compliance with applicable federal law and regulations. . . . The department may promulgate rules and issue orders restricting the polluting content of any waste material or polluting substance discharged or sought to be discharged into any lake, river, stream, or other waters of the state. The department shall take all appropriate steps to prevent any pollution the department considers to be unreasonable and against public interest in view of the existing conditions in any lake, river, stream, or other waters of the state.

Further, MCL 324.3109 provides:

(1) A person shall not directly or indirectly discharge into the waters of the state a substance that is or may become injurious to any of the following:

(a) To the public health, safety, or welfare.

(b) To domestic, commercial, industrial, agricultural, recreational, or other uses that are being made or may be made of such waters.

(c) To the value or utility of riparian lands.

(d) To livestock, wild animals, birds, fish, aquatic life, or plants or to the growth, propagation, or the growth or propagation thereof be prevented or injuriously affected; or whereby the value of fish and game is or may be destroyed or impaired.

(2) The discharge of any raw sewage of human origin, directly or indirectly, into any of the waters of the state shall be considered prima facie evidence of a violation of this part by the municipality in which the discharge originated unless the discharge is permitted by an order or rule of the department. If the discharge is not the subject of a valid permit issued by the department, a municipality responsible for the discharge may be subject to the remedies provided in section 3115. If the discharge is the subject of a valid permit issued by the department pursuant to section 3112, and is in violation of that permit, a municipality responsible for the discharge is subject to the penalties prescribed in section 3115.

The above-quoted provisions grant the DEQ substantial powers to limit water pollution. Moreover, the DEQ is the only agency authorized to grant a discharge permit for waste effluent into the waters of the state, and any person who desires to discharge or dispose of waste or operate a wastewater treatment plant must apply with and obtain a permit from the DEQ. MCL 324.3112(1).[4] As further evidence of the DEQ's broad powers regarding water pollution, the Legislature expressly gave to the DEQ exclusive criminal and civil enforcement authority. Also, NREPA grants to the DEQ power to seek injunctive relief for any violations of NREPA or for any violation of a permit issued by the DEQ under NREPA.

---

[4] MCL 324.3112 provides, in part:

(1) A person shall not discharge any waste or waste effluent into the waters of this state unless the person is in possession of a valid permit from the department. Compliance with the terms of an outstanding order of determination or final order of determination or stipulation with the former water resources commission that is in effect on April 15, 1973, shall be considered to meet the requirements of this section until the department issues its permit. The department shall condition the continued validity of a permit upon the permittee's meeting the effluent requirements that the department considers necessary to prevent unlawful pollution by the dates that the department considers to be reasonable and necessary and to assure compliance with applicable federal law and regulations. If the department finds that the terms of a permit have been, are being, or may be violated, it may modify, suspend, or revoke the permit or grant the permittee a reasonable period of time in which to comply with the permit. The department may reissue a revoked permit upon a showing satisfactory to the department that the permittee has corrected the violation. A person who has had a permit revoked may apply for a new permit.

(2) If the department determines that a person is causing or is about to cause unlawful pollution of the waters of this state, the department may notify the alleged offender of its determination and enter an order requiring the person to abate the pollution or refer the matter to the attorney general for legal action, or both.

A careful review of these and other statutory provisions of NREPA lead us to conclude that the Legislature impliedly intended to preempt the field of regulation regarding discharge of waste into the waters of this state and the establishment of discharge effluent limits. Plainly, our Legislature enacted a pervasive state regulatory scheme with the DEQ having sole responsibility for regulation of point source discharges into the waters of our state.

### B. SUBJECT MATTER OF REGULATION

The subject matter of the regulation, the control of pollution entering the state's inter-connected waterways, clearly calls for a statewide, uniform system of regulation. The state's ability to control water pollution statewide would be substantially undermined by a Balkanized patchwork of inconsistent local regulations. As intervener, the DEQ correctly points out in its brief:

> The state has an interest in insuring that all the wastewater treatment plants located within the state are regulated in an even-handed fashion. Further, in order to serve the state's interest in achieving clean water bodies flowing through its borders, it is necessary for the state to achieve uniformity.

The Legislature recognizes this need for uniformity by mandating that the DEQ protect *all* the waters of this state. Again, MCL 324.3103(1) grants the DEQ the duty and authority to "protect and conserve the water resources of the state . . . ." The Legislature vested in the DEQ this important job of preserving our state's valuable water supply with the imperative that the DEQ control the pollution of *all* the "waters of the

state and the Great Lakes." *Id.* And, our Legislature broadly defined the interconnectedness of the "[w]aters of the state" as "ground waters, lakes, rivers and streams and all other watercourses and waters within the jurisdiction of this state . . . ." MCL 324.3101(i). Again, when specifically addressing pollution standards, the Legislature made clear its understanding that the subject matter warranted uniform, statewide regulation:

> The . . . [DEQ] . . . shall establish pollution standards for lakes, rivers, streams, and other waters of the state in relation to the public use to which they are or may be put, as it considers necessary. [MCL 324.3106.]

Consistently with the fact that our state's waters are connected and flow through many and varied localities, the Legislature invested in one agency, the DEQ, the public trust of protecting "*all*" our state's waters, which protection can only be accomplished by a statewide, consistent, and coherent uniform policy. "The [DEQ] shall take all appropriate steps to prevent any pollution the [DEQ] considers to be unreasonable and against public interest in view of the existing conditions in *any* lake, river, stream, or other waters of the state." MCL 324.3106 (emphasis added).

Again, to ensure uniformity and consistency, the Legislature specifically prohibits any person[5] or entity from discharging any waste effluent (the precise subject in issue here) into any waters of this state unless the DEQ grants permission to do so. MCL 324.3112(i).

---

[5] Under MCL 324.301(g), " 'Person' means an individual, partnership, corporation, association, governmental entity, or other legal entity."

Moreover, any person, including a city or township, that is aggrieved by the DEQ's issuance of a permit may, as here, request and have a contested hearing under the APA. MCL 324.3112(3). This procedure for local input by way of contested hearings and the ultimate adoption or rejection by the head of the DEQ ensures uniformity and coherence of a statewide policy to protect our state's water resources.[6]

Although our review of Michigan case law uncovered no published decisions that address the specific question whether the DEQ's source point discharge regulations preempt a more restrictive local ordinance, we note that our decisions applying *Llewellyn* to other environmental law cases reinforce our conclusion that NREPA preempts Hamburg's ordinance. Relying on the *Llewellyn* test, our Court has held that state statutes that regulate *solid waste* disposal preempt local laws because the Legislature provided a comprehensive and pervasive regulatory scheme and the subject matter to be regulated calls for uniformity and consistency throughout the state. *Southeastern Oakland Co Incinerator Auth v Avon Twp*, 144 Mich App 39; 372 NW2d 678 (1985). As this Court observed, "[a]s with hazardous wastes, the management and disposal of solid wastes is clearly an area which demands uniform statewide treatment." *Id.* at 45.

Also, in *Cascade Twp v Cascade Resource Recovery, Inc*, 118 Mich App 580; 325 NW2d 500 (1982), remanded 422 Mich 882 (1985), on remand lower court reversed and remanded unpublished opinion per curiam of the Court of Appeals, issued December

---

[6] Here, the October 30, 2000, decision of the hearing referee after a lengthy trial was adopted and incorporated on December 1, 2000, by Russell J. Harding, Director of the DEQ.

12, 1986 (Docket No. 84946), mod after remand 428 Mich 894 (1987), this Court held that statutes that regulate *hazardous waste* disposal preempt local laws because the statute expressly preempts local laws, but also on the alternative grounds that the pervasive and comprehensive scheme and the subject matter mandate preemption. The Court stated that, "[t]he comprehensiveness of this statutory scheme indicates that the Legislature has preempted the field of hazardous waste management." *Id.* at 588.

In determining preemption applicable in *Cascade*, our Court also concluded that the subject matter regulated requires statewide treatment:

> Lastly, the safe management and disposal of hazardous wastes is clearly an area which demands uniform, statewide treatment. . . . The Legislature recognized that hazardous waste disposal areas evoke such strong emotions in localities that the decision as to where a landfill should go should not be given to the locality, which is far more swayed by parochial interests than the state. The Legislature, instead, gave the power to a centralized decision maker who could act uniformly and provide the most effective means of regulating wastes. [*Id.* at 590-591]

Similarly, here, the effective regulation of water pollution requires statewide treatment.

Recognizing this imperative, our Legislature enacted a broad, detailed, and multifaceted legislative scheme to manage "point source pollution control."[7] Clearly, if each municipality, township, and county were able to establish its own effluent discharge limitations, as urged by defendant, "a great deal of uncertainty and confusion would be created." *Llewellyn,*

---

[7] See NREPA, art II, ch 1, part 31, MCL 324.3101 *et seq.*

*supra* at 327. As aptly explained by the DEQ in its appeal brief:

> The regulation of the discharge of waste into the waters of the state clearly demands exclusive state regulation requiring statewide uniformity in standards necessary to serve the state's purposes and interests. To allow local units of government such as townships, counties or cities to enact discharge limits concerning discharges into waters located within or passing through these jurisdictions, would result in statewide confusion concerning conflicting discharge limits. Such a regulatory scheme would create a crazy quilt patchwork scheme of regulation under which certain dischargers could be found to violate certain discharge limits enacted by certain local units of government and not violating other local units of government's discharge limits. Every discharger in the State of Michigan must be regulated by a uniform, statewide scheme of regulation in order to be able to know, in advance, what discharge limits it will need to comply with statewide.

### IV. CONCLUSION

For all the foregoing reasons, we hold that part 31 of NREPA preempts § 5 of Hamburg's Ordinance No. 69, and therefore affirm the trial court's preemption ruling.[8]

---

[8] We also affirm the trial court's ruling that the intergovernmental agreement between the parties is binding and the agreement contemplates the expansion of the wastewater treatment plant. Contrary to Hamburg's assertions, the agreement does not expressly state that Brighton will build only a 1.52 million gallon facility. The agreement actually contemplates expansion because it grants Brighton the authority to manage the facility, requires it to ensure that it does not exceed design capacities, and does not expressly prohibit Brighton from expanding the design capacity. For these reasons, Hamburg was required to follow the agreement and it could not impose additional requirements on Brighton, including the ordinance requiring a franchise agreement.